PIONEER PARACHUTE COMPANY, INC., *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 3367.    Promulgated May 31, 1946.

*Edmund S. Kochersperger, Esq.*, for the petitioner.
*Charles P. Reilly, Esq.*, for the respondent.

OPINION.

HARLAN, *Judge*: The pertinent provisions of the Internal Revenue Code are set forth in the margin.[1]

The respondent contends that because of the nature of the class B preferred stock issued to Ford and Smith, Cheney Brothers did not own 95 percent of the voting stock of the petitioner during 1941, and that stock which it did not own was also not limited and preferred as to dividends as required under section 730 of the code. Therefore respondent contends that these corporations were not entitled to join in consolidated returns for that year. In support of his contention respondent urges that the Government is not bound to recognize as genuine a change in capital structure which is without substance and designed solely so that the taxpayer might obtain a tax advantage without changing the true nature of its operation or organization. Respondent also urges that the true nature of the transaction presented by the petitioner is that Ford and Smith, who prior to 1941 had been the owners of 40 percent of the voting stock, which was not limited and not preferred as to dividends, never lost any of their rights and privileges as such common stockholders after they had "surrendered" their voting stock for a like number of shares of class B preferred stock; that the effort to simulate compliance with the Internal Revenue Code by declaring in the amendment to the articles of incorporation that the class B stock should be nonvoting was a mere formalism, existing solely as an attempt to reduce petitioner's liability for taxes; and that the practical and legal effect of the power given to the holders of the class B preferred stock to convert the same instantly into voting nonpreferred stock was to make the preferred stock the equivalent in all respects to common stock.

The petitioner contends, on the other hand, that the actual facts and not the possibilities of the situation control in the matter of stock ownership for the purposes of consolidated returns; that the class B preferred stock was nonvoting stock and was limited and preferred as to dividends; that the provision whereby it might be converted into

---

[1] SEC. 730. CONSOLIDATED RETURNS. * * *

(a) PRIVILEGE TO FILE CONSOLIDATED RETURNS.—An affiliated group of corporations shall, subject to the provisions of this section, have the privilege of making a consolidated return for the taxable year in lieu of separate returns. * * *

* * * * * * *

(d) DEFINITION OF "AFFILIATED GROUP."—As used in this section, an "affiliated group" means one or more chains of includible corporations connected through stock ownership with a common parent corporation which is an includible corporation if—

(1) At least 95 per centum of each class of the stock of each of the includible corporations (except the common parent corporation) is owned directly by one or more of the other includible corporations; and

(2) The common parent corporation owns directly at least 95 per centum of each class of the stock of at least one of the other includible corporations.

As used in this subsection, the term "stock" does not include non-voting stock which is limited and preferred as to dividends.

common or voting stock did not in fact make it voting stock; and that the action taken by the parties was entirely proper and authorized by law.

Thus two questions are presented for disposal:

(1) Are the class B preferred stock shares nonvoting?

(2) Are said shares limited and preferred as to dividends?

The holders of the class B preferred stock were entitled to notice of all stockholders' meetings the same as the holders of the common stock. Prior to any stockholders' meeting, a holder of any class B preferred stock was given the privilege of converting it into voting common stock, and upon such conversion he had the right to vote thereafter; and such preferred stockholder could serve a written notice of his intention to make such conversion and after such notice was given no action of the stockholders would be valid until such conversion was accomplished.

We have not been furnished by either the petitioner or the respondent with any direct authorities on the solution of the question with which we are confronted, and it is not our intention to indulge in any prolonged discussion of the authorities cited. However, the powers of the class B preferred stockholders in this case do bear considerable analogy to those of the holders of the voting trust certificates involved in the case of *Kansas O. & G. Ry. Co,* v. *Helvering*, 124 Fed. (2d) 460. In that case, pending a reorganization, the stockholders and bondholders of the petitioner railway delivered their stocks and bonds to a voting trustee to enable the trustee to act in the contemplated reorganization. After the voting trust was terminated notice was sent to all of the stockholders to reclaim their stock, but a substantial percentage neglected to do so. However, a consolidated return was filed by the affiliated group of corporations, including the reorganized railway, and the Commissioner questioned the right to a consolidated return because, if the voting shares of stock held by the trustee but unclaimed by the owners were counted, the parent company would not own the necessary percentage of the voting stock to permit a consolidated return. The court held that the outstanding unclaimed stock should be so counted and denied the privilege of filing a consolidated return. In so holding the court said:

Nor is it of any consequence that the trust receiptholders cannot vote the stock to which they are entitled until stock certificates therefor have been issued to them. The stock is voting none the less. *It is the voting privilege with which a particular stock issued is endowed and not whether it is voted which determines its voting character within the intent of the Revenue Acts of 1932 and 1934.* [Italics supplied.]

In that case the stockholder was required only to present his receipt and demand delivery of the voting stock from the voting trustee in order to acquire that stock. In the case at bar the holders of class B

stock at any time had only to present their class B stock to the secretary of the company and demand their common voting stock in order to acquire the same.

It will thus be seen that the situation of the class B preferred stockholders in the pending case is far different from that of the stock option holders in *Commissioner* v. *Smith*, 324 U. S. 177, or in *Doernbecher Mfg. Co.*, 30 B. T. A. 973 (also 80 Fed. (2d) 573), wherein the option holders had merely made a partial payment on the stock and could not obtain actual ownership of the same or actual voting power until the full payment was made and the stock certificates delivered. The option holders did not have title to the stock. They merely had a privilege of purchasing the stock in the future.

The case at bar is also very easily distinguishable from those cases in which the stock to which the stockholder has title may become voting stock and may have the privilege of unlimited dividends, depending upon exigencies which are wholly beyond the control of the stockholders. Typical of such cases are *Vermont Hydro-electric Corporation*, 29 B. T. A. 1006, and *Erie Lighting Co.* v. *Commissioner*, 93 Fed. (2d) 882. Obviously, where the voting power of the stock or the limited and preferred nature of the dividends to which the stock is entitled may be changed by the happening of some event which is wholly beyond the control of the preferred nonvoting stockholders and which event may or may not ever occur, such a stockholder is not a holder of voting stock.

Petitioner lays great stress upon the fact that the holders of the class B preferred stock never anticipated any dividends and never intended to vote the stock, and that therefore the class B preferred stock should not be considered voting stock or stock entitled to unlimited dividends. The basis of his argument is the fact that one of the stockholders so testified at the time of the hearing. Unfortunately for this position, section 730 of the code does not make the *intention* of the stockholders a controlling, or even a relevant, factor in determining the voting or nonvoting character of the stock. Obviously, it is the provisions of the stock itself that control. However, there is substantial evidence, despite the testimony of the class B preferred stockholder at the hearing, that these class B stockholders intended at all times to keep and exercise every power with which they had originally been vested as common stockholders and that they had no intention of losing either their voting rights or a material part of their rights to dividends along with the common stockholders. It is interesting to note how Ford and Smith and Cheney Brothers were each very careful to protect all of their rights in relation to the other. Witness the escrow agreement at the time of the organization of the Pioneer Parachute Co. They had mutually agreed that none of them would

sell their common stock to an outsider until the offer to sell was presented to the other members of the triumvirate. However, they were obviously not willing to trust the agreement of each other in this regard and, therefore, each required the other to deposit his stock with an escrow agent so that it would be impossible to violate this agreement. Another interesting sidelight on the attitude of Ford and Smith at the time that they accepted their class B preferred stock is the letter from petitioner to them guaranteeing that in the event dividends were paid to the common stockholders they should be compensated also. At any time, furthermore, that Ford and Smith considered their position becoming precarious, or at any time they should desire to protect their rights as common stockholders in petitioner corporation, their class B preferred stock certificates and the amendment to the certificate of incorporation of petitioner granted them full power to become common stockholders with full voting power and unlimited dividend privileges at once. When they accepted class B preferred certificates they surrendered nothing but the shadow of their rights as common stockholders. They retained all of the substance of those rights.

In fact, this whole reorganization plan had nothing to do with the advancement of the business operations of petitioner and it did not bring the capital stock structure within the manifest purpose of section 730 of the code, permitting the filing of consolidated returns. The reorganization merely injected into the capital structure 398 shares of class B preferred stock which did nothing to the capital of the corporation and in no way promoted the business purposes of the corporation. The fact that the number of class B preferred shares was limited to 398, which is the exact number of shares to be exchanged by Ford and Smith, is a revealing light on the materiality and *bona fides* of this reorganization scheme. It was provided in the resolution that the offer to convert the common stock to class B preferred stock should be made to all stockholders, but there were just enough class B preferred stock shares authorized to absorb the common stock of Ford and Smith. Most opportunely and conveniently, Cheney Brothers refused to take advantage of the offer to convert. The effect of this transaction was merely to set up the appearance of a new type of stockholder without affecting the substantial rights of that stockholder. "The government may look at actualities and upon determination that the form employed for doing business or carrying out the challenged tax event is unreal or a sham may sustain or disregard the effect of the fiction as best serves the purposes of the tax statute." *Helvering* v. *Smith*, 308 U. S. 473.

In the case at bar the large excess profits carry-over which was available to petitioner and Cheney Brothers, provided this plan for a

temporary conversion of common stock into class B preferred stock could be made to have the semblance of reality, would cause any court to look upon this plan with careful scrutiny, and, when no other obvious purpose is achieved beyond the salvaging of this large excess profits carry-over, the good faith of the whole transaction is very questionable.

The case of *Commissioner* v. *Court Holding Co.*, 324 U. S. 321, is considerably in point. In that case a corporation, under a designation of "liquidating dividends" transferred real estate to its two stockholders, who forthwith sold this real estate and realized the gain involved as individuals, thus attempting to avoid a taxable gain to the corporation. The Court held that such a transfer was a mere subterfuge, designed to cover up the real nature of the transaction, and was not a genuine business operation. See also *Gregory* v. *Helvering*, 293 U. S. 465, where the Court said on page 469:

> The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes or altogether avoid them, by means which the law permits, cannot be doubted. * * * But the question for determination is whether what was done apart from the tax motive was the thing the statute intended.

In the case at bar the statute intended that corporations so completely affiliated by the interownership of at least 95 percent of the voting stock as to constitute in actuality one industrial economic unit should be taxed as one industrial economic unit. However, when the voting controls of affiliated corporations are not so closely held as to amount practically to one economic unit, there is no expressed intent in the revenue laws to permit a partial tax exemption, nor would any such purpose be justified. In the case at bar Cheney Brothers actually owned only 60 percent of the voting stock of petitioner corporation and did not own 95 percent thereof. Therefore the requirements of the statute have obviously not been satisfied in this case.

Judge Hand, in the case of *Commissioner* v. *Manus-Muller & Co.*, 79 Fed. (2d) 19; certiorari denied, 296 U. S. 657, forcibly expressed the situation when he said: "Affiliation is a privilege in any case akin to an exemption and doubts go against the taxpayer."

It is therefore our decision that the class B preferred stock of Pioneer Parachute Co. must be treated as voting stock.

While the determination of the second question presented, pertaining to the limited or unlimited character of the dividends to which the holders of the class B stock are entitled, becomes of minor importance in view of our holding that said stock must be treated as voting stock for the purpose of filing consolidated returns, nevertheless, we must also hold that the so-called class B preferred stock was not in fact limited as to dividends. This holding is based upon the contents of the letter of March 24, 1941, sent by the Pioneer

Parachute Co. to Ford and Smith, by which letter the company entered into a contract with Ford and Smith, "in consideration of the surrender" by Ford and Smith of their common shares, to pay Ford and Smith for each share of the class B preferred stock held by them or either of them two-thirds of any dividend which might be declared in the future on each of the common stock shares remaining outstanding. The enforceability of this contract has not been questioned and the payments to be made by the Pioneer Parachute Co. to Ford and Smith were to be in direct proportion to the number of shares which they held and were to be limited only by the amount of dividends which the common shareholders were to receive. Such amount to be received by the class B preferred shareholders was not limited and, since it was in direct proportion to the number of shares held, such payments would in fact be dividends, regardless of the bookkeeping process by which the payments were made or the name by which they were designated. See *Twin City Tile & Marble Co.*, 6 B. T. A. 1238; *Gould-Mersereau Co.*, 21 B. T. A. 1316, at page 1325; and *Bruckner Realty Corporation*, 20 B. T. A. 419, at page 426.

It follows that Cheney Brothers did not own 95 percent of the voting stock of the petitioner which was not limited and not preferred as to dividends during the period from March 30 to December 31, 1941, and it was not entitled to join with petitioner in a consolidated return.

*Judgment will be entered for the respondent.*